J-S22017-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: K.S., MOTHER | : | No. 262 WDA 2024 |

Appeal from the Order Entered January 30, 2024
In the Court of Common Pleas of Armstrong County Orphans' Court at
No(s): Case No. 13 of 2023

| | | |
|---|---|---|
| IN THE INTEREST OF: S.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: K.S., MOTHER | : | No. 263 WDA 2024 |

Appeal from the Order Entered January 30, 2024
In the Court of Common Pleas of Armstrong County Orphans' Court at
No(s): 012-ADOPT-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: S.L.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: K.S., MOTHER | : | No. 264 WDA 2024 |

Appeal from the Order Entered January 30, 2024
In the Court of Common Pleas of Armstrong County Orphans' Court at
No(s): No. 11 of 2023

BEFORE:   PANELLA, P.J.E., LANE, J., and BENDER, P.J.E.

MEMORANDUM BY LANE, J.:                    **FILED: July 9, 2024**

K.S. ("Mother") appeals from the orders involuntarily terminating her

parental rights to her children: her son A.S. (born in June 2009); and

daughters S.S. (born in November 2007) and S.L.S. (born in December 2015) (collectively "Children").[1]  We affirm.

Mother and her husband, A.S. ("Father"), are the parents of the Children.  The trial court summarized the underlying facts, which Mother does not dispute:

> In late 2020, Father was charged with sexual offenses against S.S.[, the oldest child,] as well as offenses naming A.S. and S.L.S. as victims for being present . . . and witnessing the offenses.  Mother did not believe the allegations made by the [C]hildren, and when Father posted bail she continued to live with him in the family home.  . . .

Trial Court Opinion as to S.S., 1/30/24, at 2.[2]

The Armstrong County Children, Youth, and Family Services agency ("CYFS") prepared a safety plan and placed the Children with their maternal grandmother.  The Children were removed from the parents' home due to

> the risk that Father would continue to offend against one or more of the [C]hildren[,] Mother's refusal to believe her [C]hildren when they reported the sexual abuse, and Mother's unwillingness to take action to prevent her [C]hildren from being removed from the home [but continuing] to enjoy the marital residence with Father.

_____

[1] The trial court also terminated Father's parental rights to the Children, but he has not appealed.

[2] The trial court filed separate opinions pertaining to each child.  The first seven pages of each opinion, which summarize the procedural history and evidence presented at the termination hearing, are identical, while the remaining pages are particularized to each child.

Trial Court Opinion as to S.S., 1/30/24, at 7. On January 7, 2021, the trial court adjudicated all three Children dependent. We note that at this time, S.S. was thirteen years old, A.S. was eleven, and S.L.S. was five.

CYFS developed a permanency plan, which included three goals for Mother: to complete a parenting assessment, mental health assessment, and non-offender assessment.[3] Although CYFS reviewed the permanency plan with Mother, and the same permanency plan was set forth in subsequent review orders, Mother refused to sign most of them. *See* N.T., 1/16/24, at 17. "CYS informed Mother that it had determined that the allegations of sexual abuse were 'indicated,' but Mother persisted in her support of her husband and would not believe the [C]hildren." Trial Court Opinion as to S.S., 1/30/24, at 2.

The Children lived with their grandmother for fourteen months. *See* N.T., 1/16/24, at 27. During that time, "the [C]hildren were truant, their mental health was deteriorating, and they had poor hygiene and a lack of medical and dental care." Trial Court Opinion as to S.S., 1/30/24, at 2. During this time, Mother had "unfettered" visitation, to be supervised by her parents, meaning "[s]he could go whenever she wanted," but she could not live at the

---

[3] At the termination hearing, the CYFS caseworker described non-offender treatment as helping a parent to: "understand what happened to the child;" recognize "how [the parent's] role, even though they were not actively involved," in not believing the child harmed the child; and learn how to help the child move forward. N.T., 1/16/24, at 19.

grandmother's home. N.T., 1/16/14, at 29, 37. However, Mother did not visit "for long periods of time," and when she did visit, the visits were "very brief." *Id*.

Subsequently, the grandmother became ill and could not care for the Children. In March 2022, the Children were placed separately. S.L.S., the youngest child, was in a pre-adoptive home and, at the time of the termination hearing, was "thriving." Trial Court Opinion as to S.S., 1/30/24, at 3. S.S., the oldest child, was placed "at Bethesda Lutheran Services and continue[d] to struggle with mental health issues," which have included self-harm. *Id*. at 3, 9. S.S. "was very upset by her Mother siding with Father," and "has told the *guardian ad litem* that she never wants to see [M]other again." *Id*. at 9. A.S. was placed "at Abraxas youth home, has some delinquency issues and has absconded in the past from other facilities." *Id*. at 3. Further, A.S. was "placed both as a dependent child and as a delinquent child." Trial Court Opinion as to A.S., 1/30/24, at 8.

The trial court periodically entered dependency orders for all three Children, from May 2021 through June 2023. Mother completed a parenting assessment in July 2022. The following month, she underwent a psychological evaluation by psychologist Caroline Menta, Psy.D. In her interview, Mother continued to state she did not believe the Children's claims of sexual abuse. *See* N.T., 1/16/24, at 69. Dr. Menta recommended Mother to enroll in individual therapy. In April 2023, Dr. Menta conducted a protective capacity

evaluation of Mother to address her continued incredulity of the Children's allegations. *Id*. at 40, 74. This type of follow-up evaluation is undertaken when the parent-child relationship is not improving, in order to "look at what things could . . . improve a parent's ability to appropriate care [for] their child." *Id*. at 74. With regard to her goal of completing non-offender assessment, Mother did not complete any of her three goals.

Meanwhile, in February 2023, Father's criminal charges proceeded to a jury trial. At this time, two years had passed since the Children's removal from the parents' home, and Mother had continued to live with Father. "Mother remained by Father's side throughout the trial . . .. The children were stunned when they testified [at trial] to see that [M]other was supporting [F]ather and not them. S.S., in particular, was very hurt and angry with her mother." Trial Court Opinion as to S.S., 1/30/24, at 3. Father was found guilty of the offenses and received a sentence of ten to twenty years' imprisonment.[4] Following his convictions, Mother informed the CYFS caseworker that she no longer supported Father and wished to be reunited with the Children. *See* N.T., 1/16/24, at 38.

---

[4] Father was found guilty of: (1) aggravated indecent assault with respect to S.S.; (2) endangering the welfare of a child and corruption of minors with respect to both A.S. and S.L.S.; and (3) open lewdness with respect to A.S. *See* Mother's Brief at 9; *see also* Trial Court Opinion as to A.S., 1/30/24, at 8; Trial Court Opinion as to S.L.S., 1/30/24, at 8.

Around the same time, in February 2023, the trial court suspended Mother's visitation with the Children, "in light of her continue[d] support of [F]ather . . . pending determination of pursuing the concurrent goal of adoption." **See** Permanency Review Order as to S.S., 2/13/23, at 1. Because of this suspension, CYFS terminated Mother's parenting classes at this time, consistent with its standard policy. N.T., 1/16/24, at 38, at 57-58. In early June 2023, the trial court denied Mother's motion to resume supervised visitation, after a hearing and review of a report Dr. Menta, finding it would not be in the Children's best interest.

On June 6, 2023 — almost two and one-half years after the Children were removed from the parents' care and adjudicated dependent — CYFS filed the underlying petitions to involuntarily terminate Mother's and Father's parental rights. In August 2023, Mother underwent a second psychological evaluation with a psychologist of her own choosing. The trial court conducted a termination hearing, at which CYFS caseworker Kylie Simmons and Dr. Menta testified. Mother, represented by counsel, also testified and presented an expert witness, Dr. Terry O'Hara, a psychologist who conducted Mother's second psychological evaluation. Father did not appear but was represented by an attorney. The Children likewise did not appear, but were represented by one shared guardian *ad litem*, as well as separate counsel.[5]

---

[5] One attorney represented A.S., while another attorney jointly represented S.S. and S.L.S.

On January 30, 2024, the trial court terminated Mother's parental rights under 23 Pa.C.S.A. § 2511(a)(8) and (b), as well as Father's parental rights. Mother filed timely notices of appeal and Pa.R.A.P. 1925(a)(2) concise statements of errors complained of on appeal.

Mother presents the following issue with respect to all three Children:

> . . . Did the court abuse its discretion or make an error of law in not attending to the testimony that CYFS severed services provided to [Mother] prior to a change of goal from return home . . . to adoption as well as prior to a finding by the court terminating [Mother's] parental rights?

Mother's Brief at 6-7.[6] With respect to A.S. only, Mother raises an additional issue: "Did the court abuse its discretion by finding that termination of parental rights would be in the best interest of the child?" *Id*. at 7.

_____

[6] Mother has filed three briefs, one at each Child's docket. As her discussions of this first issue are nearly identical, for ease of discussion we cite only to the brief filed at A.S.' docket.

Furthermore, we note all three briefs include two additional issues in the statement of questions involved:

> Does the record support the finding of fact made by the court that [Mother's] psychological condition renders her incapable of properly caring for her child?

> In the alternative, if the record does support the aforementioned finding, did the court abuse its discretion by demonstrating manifest unreasonableness in setting aside the opinions of [Mother's] expert as to [her] mental state as well as the condition of [CYFS'] report?

Mother's Brief at 5-6. However, Mother also states she has decided to not pursue these issues on appeal. *See id*.

In her first issue, Mother argues the trial court erred in terminating her parental rights under subsection 2511(a)(8), where CYFS improperly severed her "ability to obtain services" *before* the goal was changed from reunification to adoption. Mother's Brief at 13. Our review of an order granting a petition to terminate parental rights is limited. *See Interest of S.K.L.R.*, 256 A.3d 1108, 1127 (Pa. 2021) ("*S.K.L.R.*"). We are "required to accept a trial court's finding of facts and credibility determinations if they are supported by the record. If the trial court's factual conclusions are supported by the record, then [we] examine whether the trial court abused its discretion[.]" *Id*. (citation omitted).

> [P]arents enjoy a fundamental constitutional right to raise their children as they deem fit. The involuntary termination of a parent's rights to a child obviously constitutes a state's most extreme and permanent measure of interfering with that right. Consequently, . . . any party seeking this remedy must prove by clear and convincing evidence that termination of a parent's rights is warranted pursuant to 23 Pa.C.S.[A.] § 2511.

*Id*. at 1126 (citations omitted).

> This Court has stated:

> Termination of parental rights is controlled by statute. *See* 23 Pa.C.S.A. § 2511[.] Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a).

> Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b):

- 8 -

determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (some citations omitted and paragraph break added).

Subsection 2511(a)(8) provides that a trial court may terminate parental rights when

[t]he child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(8).

Mother argues the trial court erred or abused its discretion in terminating her parental rights, where CYFS improperly and "unilaterally terminat[ed]" the parenting classes while the goal was still reunification. Mother's Brief at 14. In support, Mother contends that in *S.K.L.R*., the Pennsylvania Supreme Court held that so long as a child's goal remains reunification, "concurrent planning requires that an agency continue to provide appropriate reunification services to the family while pursuing potential termination of parental rights." *Id*. (*quoting S.K.L.R.*, 256 A.3d at 1129). Mother reasons she had "little to no funds of her own, was unable to procure services for herself," and that due to CYFS' actions, she could not

remedy "the conditions which led to the removal or placement of the" Children.[7] Mother's Brief at 13 (*quoting* 23 Pa.C.S.A. § 2511(a)(8)), 14, 16.

In addressing Mother's issue, the trial court first set forth the reasons for the removal of the Children from her care: her refusal to believe the Children's claims of Father's sexual abuse and her "unwillingness to take action to prevent her children from being removed from the home [while she] continued to enjoy the marital residence with Father." Trial Court Opinion as to S.S., 1/30/24, at 7. The trial court then considered, pursuant to subsection 2511(a)(8), whether these conditions continued to exist. The trial court reviewed the extensive testimony concerning Mother's psychological evaluations, specifically her refusal or failure to accept responsibility for the harm she caused Children, and her prioritization of her own needs, as well as Father's needs, over her duty to protect the Children. The court reasoned:

> Dr. Menta's opinion is that Mother has significant depressive symptoms, has very little empathy for her children and lacks insight into her children's behavioral issues. Dr. Menta testified that Mother is focused on her own needs, and those of [Father], and not on the needs of the [C]hildren. Mother externalizes blame, so that in her view she and [Father] have not done wrong.
>
> Dr. Menta recommended follow-up counseling. Mother apparently enrolled in counseling at Family Psychological in Indiana, Pennsylvania in December 2022. She claims to have signed releases, and assumed that Family Psychological gave information to [CYFS]. However, [CYFS] has never received anything from Family Psychological.

---

[7] Mother concedes the first two elements of subsection 2511(a)(8) have been established — that the Children were removed from her care and that twelve or more months or have elapsed from the removal.

        In 2023 Dr. Menta also performed a "protective custody evaluation" of Mother. By the time of that evaluation, Father had been convicted and incarcerated. Mother had done a complete about-face and now claimed to believe her children about the abuse.

        At the protective custody evaluation, Mother [also] accused Father of mental and emotional abuse against her. As noted in Dr. Menta's report, Mother testified in open court that she chose to stay with [Father] because she needed his income to pay the household bills. Then, when he was convicted and jailed, she told Father she wanted nothing to do with him and promptly filed for divorce.

        Dr. Menta testified that Mother's reversal does not support veracity regarding her belief or disbelief of her daughter. In other words, Mother chose to disbelieve her daughter when Mother needed Father's income. Then when Father was out of the picture, Mother chose to believe her daughter because that is now what is in Mother's best interest. Mother does what is best for Mother, not the [C]hildren.

        In addition, and very importantly, Dr. Menta testified that Mother remains at a significant risk of repeating this pattern of behavior. She externalizes all blame, now casting it all on Father, but she does not acknowledge her own parental duty to have done the right thing for her children. Therefore, Dr. Menta concludes that Mother's psychological makeup lends itself to putting her own self-interest above that of her children, which obviously had disastrous consequences on this family even after the children were removed from the home.

Trial Court Opinion as to S.S., 1/30/24, at 4-6.

        The trial court found the removal of Father from the family home did not

resolve Mother's inability to protect and care for the Children:

        While the incarceration of Father for the next ten years eliminates him as a source of risk, Mother's psychological weakness makes her unable to properly care for the [C]hildren. If the [C]hildren were returned to her care, she would continue to pose a risk. Dr. Menta testified that Mother lacks empathy for the

- 11 -

[C]hildren and lacks insight into her own role in all of this. She emphasized her own needs and Father's needs over the needs of the [C]hildren. Dr. Menta opined: "[Mother] remains at significant risk of repeating this pattern of behavior." That extends beyond the narrow circumstances of allowing a sexual predator to have access to the [C]hildren. The more generalized concern is that Mother[ ] externalizes all blame, minimizes her own accountability, and would rather let the [C]hildren suffer than suffer any consequences herself, such as losing the breadwinner of the household. That makes Mother an ongoing risk if the [C]hildren were returned to her.

*Id*. at 8.

On appeal, Mother does not address, let alone challenge, any of the trial court's extensive discussion concerning: her lack of empathy for the Children; her prioritization of her own needs over the safety of the Children, even when faced with claims of sexual abuse by Father; the lack of "veracity" in her reversal of support for Father, made only after he was convicted and could no longer share or provide his income; her tendency to "externalize[ ] all blame" and minimize her failure to protect the Children; and, importantly, her "significant risk of repeating this pattern of behavior." *Id*. at 7-8. Instead, Mother singularly focuses on CYFS' alleged interference with her ability to participate in parenting classes or a non-offender assessment. The trial court's finding of fact and credibility assessments of Dr. Menta and Caseworker Simmons are supported by the record, and thus are binding on this Court. *See S.K.L.R.*, 256 A.3d at 1127. In the absence of any challenge by Mother to the court's above reasoning, we conclude no relief is due on her claim.

Furthermore, we determine Mother's arguments are meritless. Mother claims it was CYFS who "unilaterally terminat[ed her] ability to obtain services that would [have remedied] the matters causing placement." Mother's Brief at 14. This argument ignores the trial court's findings that over an extended period, Mother consistently failed to comply with her goals:

> . . . Mother had three requirements under the permanency plan. [The f]irst was to complete a parenting assessment. She did [not do this] until July . . . 2022 — 18 months into the case. Since Mother had never made any arrangements to do this on her own, [CYFS] set up the appointment and wrote Mother a letter instructing [her] where and when the evaluation would take place. Mother has since attended some parenting instruction and some supervised visits with the [C]hildren, as recommended. Her attendance was "inconsistent" according to the CYS caseworker. Mother claims that the missed visits were due to her failure to understand that she had to telephone the supervising agency the day prior to the visit to confirm.
>
> Similarly, Mother never made arrangements for a mental health assessment. So [CYFS] scheduled an appointment with Dr. . . . Menta to perform a psychological evaluation [in] August . . . 2022 — 19 months into the case. Dr. Menta's findings are discussed [above].
>
> The third component of the permanency plan for Mother was a non[-]offender assessment, which has never occurred.

Trial Court Opinion as to S.S., 1/30/24, at 3-4.

The trial court's findings are supported by the record. Caseworker Simmons testified that for almost a year and a half after the Children's placement, Mother accomplished "nothing . . . at all" under her permanency plan. N.T., 1/16/24, at 22. Caseworker Simmons stated she "continually asked" Mother about her progress on the parenting, mental health, and non-

offender assessments, but "the answer was always no, [and] that they couldn't get any responses back from anyone." **Id**. After Mother underwent the parenting assessment, she "participate[d] in some parenting instruction through the ACES facility," but not consistently. **Id**. at 25.

Mother does not dispute this evidence, that even when parenting programming was offered to her — and in fact required of her — she did not undergo the parenting assessment for eighteen months, and thereafter failed to consistently attend the programming. Similarly, Mother's claim, that she did not have the economic means to independently pursue the required services, is meritless, where she was not financially responsible for these services when they were offered to her throughout the first eighteen months of the Children's placement. N.T., 1/16/24, at 22. Finally, Mother does not address why she did not visit the Children "for long periods of time" over the fourteen months when they lived with her mother. N.T., 1/16/24, at 29.

Finally, on the merits of Mother's argument, we hold that no relief is due under **S.K.L.R.** In that decision, the child welfare agency "unilaterally" reduced the mother's visitation with her children, from four times per month to twice per month, when the agency filed for termination. **S.K.L.R.**, 256 A.3d at 1116, 1129. Our Supreme Court explained that "'[c]oncurrent planning 'is a dual-track system under which child welfare service agencies provide services to parents to enable their reunification with their children, while also planning for alternative permanent placement should reunification fail.'" **Id**.

at 1128 (citation omitted). The Court then stated: "When a child's goal is reunification with his or her parent, unless and until a trial court finds merit to a termination petition, concurrent planning requires that an agency continue to provide **appropriate** reunification services to the family while pursuing potential termination of parental rights." *Id*. at 1129 (emphasis added). The Court then held the agency's actions "failed to adhere to the fundamental tenets of concurrent planning," and the agency "risk[ed] that the trial court will deny the termination petition, causing the decreases in services to impede further a parent's chance of regaining custody of his or her child, and importantly, failing to serve a child welfare agency's core mission of protecting children's best interests." *Id*. at 1129.

Here, it was the trial court which suspended visitation. CYFS' action was to cease parenting treatment for Mother, and not, as in **S.K.L.R.**, unilaterally halving the mother's visitation time. In light of the all the factual history and our discussion above, we decline to find CYFS' action rose to a failure "to adhere to the fundamental tenets of concurrent planning." *Id*. For the foregoing reasons, we conclude no relief is due on Mother's first issue.

In her second issue, Mother asserts the trial court abused its discretion in finding termination of her parental rights would best serve A.S.' developmental, physical, and emotional needs.[8] We reiterate that we review

---

[8] As noted above, Mother presents no analogous issue concerning S.S. or S.L.S.

a dependency matter order for an abuse of discretion. ***See S.K.L.R.***, 256 A.3d at 1121. The grounds for termination under subsection 2511(a)(8), include a finding that termination "would best serve the needs and welfare of the child." 23 Pa.C.S.A. § 2511(a)(8). As noted above:

> Only if the court determines that the parent's conduct warrants termination of his or her parental rights [under subsection 2511(a)] does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

***In re L.M.***, 923 A.2d at 511 (citation omitted).

> Subsection 2511(b) states:

> The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b). "'In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship.' The court is not required to use expert testimony, and social workers and caseworkers may offer evaluations as well." ***In re M.P.***, 204 A.3d 976, 983 (Pa. Super. 2019) (citations omitted).

Mother avers the trial court abused its discretion in finding, under subsections 2511(a)(8) and (b), that termination was in A.S.' best interests. She asserts her "continued absence . . . has been debilitating to A.S.," and his mental health and behavior have worsened over the last eighteen months. Mother's Brief at 20-21. Mother claims there was no medical testimony — and thus "an evidentiary gap" — about the effect termination would have on A.S.' "fragile mental health." *Id*. at 21, 22. Finally, Mother cites Caseworker Simmons' testimony that when he was informed of the possibility of termination, "more than 24 months into the proceedings," A.S. "started getting very agitated and rocking [*sic*]." *Id*. at 20. Mother contends this reaction "reveal[ed] the depths of the bond" between them and A.S.' desire to continue having her "in his life." *Id*. at 21-22. Mother also cites the guardian *ad litem*'s statement at the termination hearing that she believed A.S.' "mental health was poor." *Id*. at 20. Mother claims that the trial court's reasoning — that she "has let down A.S. at every opportunity [—] is irrelevant in light of" Caseworker Simmons' above testimony and the lack of medical testimony. *Id*. at 22-23. Finally, Mother argues A.S. "has no approved pre-adoptive home" and is "likely to spend the foreseeable future in a juvenile facility without any relationship with" her. *Id*. at 20-21.

The trial court first reiterated that A.S. was the victim of three crimes committed by Father: endangering the welfare of a child, corruption of minors, and open lewdness. The court also considered that A.S. has had juvenile

delinquency issues. The trial court addressed A.S.' welfare and developmental, physical, and emotional needs as follows:

> The *guardian ad litem* reported at the termination hearing that while A.S. was surprised and disappointed at the criminal trial to see that Mother supported Father, he nonetheless does want his Mother to continue to be a part of his life. So there is, at least facially, a parent-child bond that still exists between A.S. and Mother. The question is whether maintaining this bond serves A.S.' developmental, physical and emotional needs and welfare. I conclude that it does not.

> There is no evidence that severing whatever bond may have existed between A.S. and his parents would be adverse or-detrimental A.S. or cause him to experience any extreme emotional consequences. As of this writing, A.S. has lived separate and apart from Mother and Father for over three years. Any bond that exists, or did exist, with either parent is one that predates the filing of the criminal charges against Father. Despite A.S.['] feelings about his Mother, she has let him down in every respect for over three years. . . . The Court concludes that there is clear and convincing evidence that any bond with Mother and Father is not necessary and beneficial to [A.S.]

> The Court recognizes that there are currently no foster parents or pre-adoptive home for A.S. at this point. But, as discussed above, a return to Mother is not in [A.S.'] best interest. . . .

Trial Court Opinion as to A.S., 1/30/24, at 9.

At the termination hearing, Caseworker Simmons testified that at Father's criminal trial, A.S. was "frustrated [by] seeing [Mother] in the courtroom with" Father, stated he was not feeling well, and left the trial. N.T., 1/16/24, at 61. Caseworker Simmons also stated that she discussed with A.S. "that he needs the structure that [she did not] believe [Mother was] able to give him" and that A.S. needed to continue with his treatment. *Id*. at 49.

When A.S. responded that Mother "was there [in] the home," Caseworker Simmons replied that while "[s]he was there for periods of time, . . . then she was not," and A.S. was "only choosing to remember whenever [Mother] was there." *Id*. At this time, A.S. "started getting very agitated and rocking [sic] [and thus they] stopped the conversation." *Id*. A.S. further "indicated that he would like to go back home with [M]other, but if he could do that he would prefer to go with his cousin." *Id*. Caseworker Simmons then explained to A.S. that going into his cousin's care was not possible because the cousin was "just not able to control him." *Id*. at 49-50.

Caseworker Simmons testified A.S. did have an emotional connection with Mother. *See id*. at 56. Nevertheless, when asked whether A.S. would suffer any negative emotional reactions if Mother's rights were terminated, the caseworker replied:

> . . . I'll answer this way. [A.S.'] mental health is very unstable. [He] is grasping onto anything that he can right now, and he sees that [Mother's] rights being terminated as the end. I am not certain what will happen with [A.S.] but I will say this, ***I do not feel that [Mother] has the ability on her own to provide [A.S.] the structure that he needs.***
>
> \* \* \* \*
>
> . . . Quite possibly, no, [termination of Mother's parental rights would not have a detrimental effect on A.S.' mental health] because it would give him an end. It would give him a finalization.
>
> . . . Mental health is pretty fluid. It's hard, and I am also not a clinician.

*Id*. at 56-57 (emphasis added).

Finally, the guardian *ad litem* advised the trial court that he talked with A.S. The guardian *ad litem* argued:

As for [what would best serve the Children's needs,] I thought long and hard . . . about [A.S.] I know he does not want to necessarily be adopted. [He knows] that his sisters . . . wanted to be adopted [and] do not want [Mother] in their picture, but he wants her in his picture.

But even at that, at 14 [years of age], I know at some other points in time [A.S.] was ready to be adopted and . . . he had made comments about that. He also has . . . a lot of mental health issues. At 14 years old, I guess I came to the same conclusion . . . that [Caseworker] Simmons had mentioned on the stand, that if [M]other's rights were terminated, it would be closure for [A.S.] He might be able to move on or move in some direction other than just sort of [being in] limbo, which is what it seems to me is where [A.S.] is at this point.

Even though [A.S.] might say at this point he doesn't want [to be] adopted, he doesn't want a new family. I think if [Mother's] rights were terminated it would give [A.S.] more options. [A.S.] wouldn't have to be adopted, because he would have to consent, but . . . if something changed or things just got better for him, he would at least have that option and we would not have to be back here and just stirring the whole pot again. I think it gives him more options, **which I think is a good reason and is in his best interest**[.] I think [CYFS has] met [its] burden.

*Id*. at 132-33 (emphasis added).

Preliminarily, we observe, as Mother concedes, that the lack of expert testimony concerning a bond, alone, is not dispositive. *See In re M.P.*, 204 A.3d at 983; *see also* Mother's Brief at 20 (stating this Court "has not required" a clinician's opinion on the effects termination would have on a child's mental health). Instead, the trial court was free to consider, and properly considered, Caseworker Simmons' testimony. In any event,

Caseworker Simmons testified A.S. did have a bond with Mother, and the trial court credited this testimony.

Nevertheless, the question of whether a bond exists is not the sole consideration under subsections 2511(a)(8) and (b). Instead, the trial court must also consider whether termination would best serve the child's developmental, physical and emotional needs and welfare, as well as "whether termination would destroy an existing, necessary and beneficial relationship." 23 Pa.C.S.A. § 2511(a)(8), (b); **see also In re M.P.**, 204 A.3d at 983.

Here, the trial court properly weighed the bond between A.S. and Mother against his developmental, physical, and emotional needs, and further considered whether termination of the bond would have a detrimental effect on A.S. Both Caseworker Simmons and the guardian *ad litem* opined that termination would not, in the context of the history of this matter, have a detrimental effect on A.S. The trial court acknowledged A.S. is not in a foster or pre-adoptive home, but also found a return to Mother's care is not in his best interests. As discussed above, the trial court found that Mother's refusal to believe the Children's claims of sexual abuse, prioritization of her own needs and Father's needs above the Children's needs and safety, and externalization of blame and refusal to take responsibility for her own actions all render her incapable of properly caring for the Children, including A.S. In light of the evidentiary record, which supports the trial court's credibility determinations and findings of fact, we conclude the court did not abuse its discretion in

finding CYFS met its burden with regard to A.S.' needs and welfare. Accordingly, we determine no relief is due on Mother's second issue.

For the foregoing reasons, we affirm the orders of the trial court terminating Mother's parental rights to A.S., S.S., and S.L.S.

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

7/9/2024